UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

_____

ASJ INTERESTS, ET AL                        CIVIL ACTION NO. 11-cv-1343

VERSUS                                       JUDGE ELIZABETH ERNY FOOTE

CHESAPEAKE LOUISIANA LP, ET AL              MAGISTRATE JUDGE MARK HORNSBY

_____

## MEMORANDUM RULING

Before the Court are cross motions for summary judgment, filed by the Plaintiffs and the Defendant, Chesapeake Louisiana, L.P. ("Chesapeake"). See Record Documents 14 and 15. The Plaintiffs instituted this suit against Chesapeake, contending that Chesapeake breached an oil and gas lease in bad faith. Through this action, the Plaintiffs seek specific performance of the lease. After briefs were submitted by both sides, the Court held oral argument on March 12, 2012.

The facts of the case are largely undisputed. It is the legal effect of those facts, namely whether a valid and enforceable mineral lease existed between the parties, that is the source of disagreement. There is no dispute that Chesapeake had extended an oral offer to the Plaintiffs to lease land owned by them, which offer had been accepted by the Plaintiffs. The agreement was reduced to writing as anticipated by the parties. Plaintiffs' counsel circulated the writing to the Plaintiffs and had obtained almost all of the Plaintiffs' signatures when Chesapeake informed Plaintiffs' counsel that it was not going to consummate the agreement. At that time, Chesapeake had not signed the agreement, had

not set up a closing date for the execution of the contract, and had not delivered the anticipated initial bonus checks. For the reasons that follow, the Court finds that no valid mineral lease existed. Accordingly, Chesapeake's motion for summary judgment [Record Document 14] shall be **GRANTED**, while the Plaintiffs' motion for summary judgment [Record Document 15] shall be **DENIED**.

I.  Background.

   A.  The Previous Mineral Lease: Section 34

The circumstances surrounding the execution of a prior lease between the same parties are relevant to this claim. In November of 2010, the Plaintiffs leased to Chesapeake the oil and gas mineral rights to 280 acres in Section 34 in DeSoto Parish, Louisiana. The compensation for Section 34 included a signing bonus of $4,500.00 an acre and 25% royalty. The lease was for a term of three years. Gary Elliott ("Elliott"), a landman working on behalf of Chesapeake, negotiated the lease with Jim Madison ("Madison"), the Plaintiffs' representative. Madison and Elliott agreed on the form and content of the lease for Section 34. Elliott then prepared the lease packages, including a lease, memorandum of lease, and W-9 tax form, and tendered those packages to Madison. Madison obtained the signature of each Plaintiff and returned the executed documents to Elliott. At that time, Elliott provided Madison with the bonus checks for each Plaintiff. The lease form, which appears to have been initially drafted by Madison, included a signature block for Chesapeake. However, Chesapeake did not sign the documents at the time it tendered the bonus payments to Madison. Rather, according to the Plaintiffs, Chesapeake

did not sign the Section 34 lease documents until sometime between two and four weeks later.

  B. <u>The Lease At Issue: Section 33</u>

  The negotiations for the lease at issue in this litigation on a second piece of property owned by the Plaintiffs began in a similar manner. On May 18, 2011, Malori Dahmen ("Dahmen"), who works for Chesapeake, contacted Elliott and directed him to begin negotiations with Madison for the mineral rights to Section 33 in DeSoto Parish. <u>See</u> Record Document 22, Exhibit 1, p. 63. On May 18, 2011, Elliott emailed Madison to inquire whether the Plaintiffs were interested in leasing the rights to Section 33. The lease offered by Elliott was $4,500.00 per acre, 25% royalty, and a three year lease term– the exact terms as the lease for Section 34. All of the Plaintiffs consented to the offer. Madison and Elliott agreed to use the same lease form as that used for Section 34. On May 20, 2011, Elliott emailed Madison and stated that he would "start lease preparations, memorandums and a bonus breakdown for the people you represent and I will get back with you as to how we will proceed." Record Document 15, Exhibit 3, p. 34. On May 25, 2011, Elliott emailed Madison:

> Attached please find the lease and memorandum for your review. I took your last lease and memorandum and changed the dates and property description. Also you will note that I updated the Lessee signature page and notary for the lease and the memorandum since the lease/memorandum, we executed for Section 34. Please review and let me know if everything is okay.

<u>Id.</u> at p. 42. Madison responded that the documents met with his approval.

The following day, on May 26, 2011, Elliott emailed Dahmen and informed her he had "verbal committments [sic] for 81% of the Mansfield Group in and to 200.00 acres. Preparing leases, memo's [sic], LPR, Ownership Reports. Should have something to you by Tuesday for approval." Record Document 22, Exhibit 1, p. 66. On May 31, 2011, Elliott prepared a more formal letter to Madison, which stated:

> Enclosed please find an Oil, Gas and Mineral Lease, a Memorandum and W-9 Form. Please make sure that Two (2) copies of the Oil, Gas and Mineral Lease and Two (2) copies of the Memorandum and W-9 Form are dated, executed, witnessed, and notarized properly. . . . **Upon receipt of the signed and notarized documents, I will hand deliver company checks to your office.**

Record Document 16, Exhibit 3, p. 45 (emphasis in original). On June 1, 2011, Madison responded, "thanks for putting the leases etc togrther [sic]. I will let you know when I have the executed docs in hand." Id. at 72. That same day, Elliott wrote back, saying "I have submitted back up to CHK for checks and as soon as I have something I will give you a call. There is a good chance I will have to be in Shreveport on Friday June 10, 2011, if not before. Will keep you posted." Id.

On June 7, 2011, the checks were prepared and approved by Chesapeake. Six of the twelve checks were mailed out that day to Elliott. See Record Document 22, Exhibit 1, p. 61. However, that evening, Chesapeake decided to remove Section 33 from the drill schedule. See Record Document 22, Exhibit 1, pp. 44-45. Beth Allison ("Allison"), who was handling the checks on Chesapeake's end, was told "hold any you get from accounting and tell them to stop payment on the others for this section." Id. at p. 44. Thereafter, Allison informed Elliott that she was directed to hold the checks. He responded, "I hope

this is just a minor delay, because these deals were made and accepted by Jim Madison, attorney for all of these people." Id. at 62. On June 13, 2011, in response to an email from Dahmen explaining that Section 33 was pulled from the schedule and Chesapeake would not proceed with any leases for that section, Elliott stated,

> We will stop making deals on all tracts in Section 33 as per your email of June 13, 2011. How would you like for me to proceed with Mr. Jim Madison of Wiener, Weiss and Madison, representing approx. 80% of Mansfield Hardwood owners. . . All these deals were made and accepted by the attorney's representing their clients and we were waiting on a few mailouts to return and the delivery of checks from CHK, so that I could pick up the signed leases in exchange for the checks.

Record Document 22, Exhibit 1, p. 68. According to Dahmen, the reason Section 33 was removed was because the economics were not working out as well as Chesapeake had hoped. See Record Document 22, Exhibit 1, p. 70.

After the deal fell through, the Plaintiffs instituted this suit, contending that Chesapeake breached the mineral leases in bad faith. That is, the Plaintiffs submit that once Chesapeake made the offer to lease and the Plaintiffs accepted that offer, a contract was formed by which Chesapeake was bound. The Plaintiffs argue that summary judgment should be entered in their favor, based on the following facts: (1) Chesapeake made an offer to lease; (2) the Plaintiffs accepted that offer; and (3) Chesapeake prepared the lease documents and forwarded them to the Plaintiffs for execution. The Plaintiffs contend that these facts establish that a binding obligation was created because Chesapeake's offer was accepted. Chesapeake seemingly agrees there was an offer and acceptance, but argues that the parties contemplated this agreement would be reduced to writing, signed by both,

and that lease agreements and bonus payments would be exchanged before it became a binding agreement.[1]  At oral argument, Chesapeake's counsel admitted that if a closing date had been established and Elliott had attended the closing, delivering the bonus checks to Madison and accepting delivery of the contracts signed by the Plaintiffs, the lease agreement would have been binding on Chesapeake.  However, Chesapeake's position is that it never signed or otherwise consented to any of the leases, and therefore is not bound by the oral offer made by Elliott.

II.   Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322, 106 S. Ct. at 2552.  If the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response.  Little

---

[1] The email exchanges between Elliott and Madison indicate an agreement to reduce the negotiations to writing.  Indeed, Elliott and Madison both believed that the lease forms would be used for Section 33, as they had been used for Section 34.  Those lease forms had a signature block for both the Plaintiffs and Chesapeake.

v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the motion is properly made, however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).  While the nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence, Little, 37 F.3d at 1075,  Wallace, 80 F.3d at 1047, all factual controversies must be resolved in favor of the nonmovant.  Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005).

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried.  Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried."  All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule."  Local Rule 56.2.

III.   Law and Analysis.

The transfer of immovable property must be in writing, by authentic act or act under private signature.   See La. Civ. Code art. 1839.  A mineral lease must also be in writing. Although an act under private signature need not be written by the parties, it must be signed by them.  See La. Civ. Code art. 1837.  Mineral leases are construed as leases generally, and, where possible, the codal provisions applicable to ordinary leases are

applicable to mineral leases, too. See Comment to La. Min. Code Art. 114; St. Romain v. Midas Exploration, Inc., 430 So.2d 1354, (La.App. 3 Cir. 4/13/83). For a contract to exist, there must be consent by both parties through offer and acceptance. See La. Civ. Code art. 1927. To constitute a contract of lease, the consent of the parties as to the thing and the rent is essential but not necessarily sufficient. See La. Civ. Code art. 2668. Consent "may be made orally, in writing, or by action or inaction," however, consent by action or inaction may be implied only under circumstances clearly indicative of consent. Id.

"When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." La. Civ. Code art. 1947. "A contract to enter into a lease at a future time is enforceable . . . unless the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon." La. Civ. Code art. 2670.

Here, the Plaintiffs submit that their lease agreement was validly reduced to writing when the lease documents, tax forms, and memoranda, prepared by Chesapeake, were signed by the Plaintiffs. Relying on Rainey v. Entergy Gulf States, Inc., 35 So.3d 215 (La. 2010), the Plaintiffs argue that the fact that Chesapeake did not sign the leases is of no moment. Rainey involved Entergy's use of the statutory employer defense, based upon a contract between Entergy and a contractor whose employee was injured on an Entergy job site. The pertinent issue was whether the contract, drafted by Entergy and signed only by the contractor, was valid. In other words, Entergy's signature was lacking. The Rainey

Court held that with respect to an act under private signature, the party who prepares a contract and presents it to the other party for their signature may not claim he is not bound by the contract because his signature is lacking. See Rainey, 35 So. at 227. "There is nothing in our Civil Code or civilian tradition requiring a signature by the party who prepared and offered the bilateral contract, where such contract was not prepared after negotiations between the parties with the intent to execute a written contract in order for that contract to be valid and effective." Id. at 229.

The Plaintiffs also rely on St. Romain v. Midas Exploration, Inc., 430 So.2d 1354 (La.App. 3 Cir. 4/13/83), for the proposition that a mineral lease need not be signed by the lessee. St. Romain explained that:

> Although it is necessary that mineral leases be in writing, it is not essential that the lessee sign the written instrument. What is required is that the lessee indicates consent to the lease agreement. In this case Midas's consent was manifested when it tendered the draft for payment of the bonus as well as its attempt to sell the mineral lease. These actions coupled with the serious negotiations regarding the lease agreement indicated Midas's intent to be bound by the mineral lease.

Id. at 1357 (internal citations omitted).

Thus, based on these cases, the Plaintiffs submit that Chesapeake became bound when the Plaintiffs accepted Chesapeake's offer to lease and when Chesapeake put the lease into written form, despite the fact that Chesapeake did not sign the documents.

In contrast, in support for its argument that no binding contract was created, Chesapeake cites Ballard v. XTO Energy, Inc., 784 F.Supp.2d 635 (W.D.La. 3/24/11) and Haire v. XTO Energy Inc., 2009 WL 4927875 (W.D.La. 12/18/09). In Ballard, the district

court found that an email by a landman, working on behalf of XTO, constituted an offer, but that the offer was not accepted. See Ballard, 784 F.Supp.2d at 640. Rather, the Plaintiffs' response to the emailed offer was an acknowledgment that the Plaintiffs were "pleased to be moving forward." Id. The email left open the question of whether approval was needed for an addendum and also hinted that questions were still unanswered. The court believed "[i]t thus plainly contemplates that negotiations can break down over those questions, and that the parties will not have executed a binding contract until they have answered all of those questions and executed a separate, signed agreement." Id. Furthermore, the court found that the parties contemplated executing additional documents before forming a binding agreement. See id. Indeed, the Plaintiffs asked the landman to forward them form commitment letters so they could begin to complete the forms. See id. That never happened. Because negotiations ended before any documents were executed, the court held there was no contract. See id.

In the Haire case, also cited by Chesapeake, XTO offered to lease the Plaintiffs' mineral rights. The Plaintiffs accepted the offer, and the landman sent XTO an email stating that XTO had "gotten" the Plaintiffs' tract. XTO never followed through with the offer, prompting the Plaintiffs to file suit based on an alleged violation of the mineral lease. Citing Fomby v. Columbia County Development Co., 155 La. 705, 99 So. 537, 541-42 (La. 1924) and St. Romain, the Haire Plaintiffs relied on the proposition that leases need not be signed by the lessee. However, the district court found that the Plaintiffs "miss[ed] the heart of the argument made by Louisiana state courts and that is there must be some

-10-

indication on the part of the lessee that indicates they wish to be bound by the agreement." Haire, 2009 WL at *2. Ultimately, the court concluded that XTO did not consent to be bound because it never tendered any money to the Plaintiffs, did not have serious negotiations over the terms, nor were there any other signs indicative of consent. See id.

In the instant case, the Court finds the facts presented fall somewhere on the spectrum between Rainey and St. Romain on the one hand and Ballard and Haire on the other. Although this case presents a close question, the Court is reminded that the burden is on the Plaintiff. As such, it is the Court's opinion that as a matter of law, the Plaintiff cannot sustain this burden.

First, the Court finds the following facts demonstrate that Chesapeake initially consented to the Section 33 lease: (1) Chesapeake prepared the leases, including the ownership chart and memoranda; (2) Chesapeake delivered the leases to the Plaintiffs; (3) there was no negotiation as to the terms of the lease; (4) the parties' prior course of dealing in Section 34 showed how the Section 33 lease was intended to work; (5) Chesapeake prepared the checks, some of which were mailed; and (6) the emailed communications between Elliot and Madison. Unfortunately, Chesapeake's initial consent is not dispositive in this case. The Court is mindful that the party who prepares a contract and presents it to the other party for their signature cannot claim not to be bound by the contract because his signature is lacking. However, in the instant case, that principle is tempered by the fact that Madison drafted the lease agreement for Section 34, after whose

-11-

form the lease agreement for Section 33 was modeled. More importantly, it was Madison who unilaterally added to the lease agreement a signature block for Chesapeake to sign. This signature block did not appear on any of Chesapeake's lease forms, but rather was intentionally added to the Plaintiffs' lease agreement by Madison himself. This act demonstrates that Madison, as the Plaintiffs' representative, contemplated obtaining Chesapeake's signature.

Moreover, the Rainey rule is plainly inapplicable in circumstances where the parties did not intend to be bound until the agreement was reduced to writing and signed by all parties. In that case, the final consent of the parties is suspended until the contract is in writing and signed by all parties. Furthermore, unlike in St. Romain, Chesapeake did not manifest its consent by tendering payments, accepting the executed lease documents or anything else. Rather, it terminated the deal before any of these things happened.

After a thorough review of the evidence presented in this case, the Court finds that there was no binding agreement reached simply through the email communications between Chesapeake and the Plaintiffs. To the contrary, the emails and the past dealings between the parties, particularly the way in which Section 34 was handled, clearly evidence an intent by the parties to "execute a written contract in order for that contract to be valid." Rainey, 35 So.2d at 229. Indeed, before the Section 34 agreement became finalized and valid, a meeting had to take place at which the parties exchanged money and documents. Like Section 34, the lease agreements for Section 33 would have become the subject of a binding obligation at the time of the closing when the negotiations were

reduced to writing, signed by at lease the landowners, and Chesapeake delivered the funds to the Plaintiffs. The parties both agree that they always intended for a closing to occur.[2]

Thus, although the parties initially may have had a meeting of the minds, there was no binding obligation on Chesapeake's part until the closing came to fruition. It is uncontroverted that this event never took place. Therefore, the lease agreements were not a binding obligation that Chesapeake could not unilaterally terminate.

III.   Conclusion.

After careful consideration of the briefs and evidence submitted by the parties, the Court finds that there are no genuine issues of material fact precluding summary judgment in favor of Chesapeake. Accordingly,

**IT IS ORDERED** that Chesapeake's motion for summary judgment [Record Document 14] be and is hereby **GRANTED**, while the Plaintiffs' motion for summary judgment [Record Document 15] be and is hereby **DENIED**. A judgment consistent with the instant memorandum ruling shall issue herewith.

THUS DONE AND SIGNED in Shreveport, Louisiana this 20th day of June, 2012.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

---

[2] The Court would be remiss not to mention that the "closing" between Elliot and Madison was never even definitively scheduled for a date certain. Rather, June 10, 2011 was simply a possible date on which Elliot may have been in the area and available to meet with Madison. Further, by June 10, 2011, Madison had not yet obtained all of the necessary signatures from the Plaintiffs.